**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

MISSISSIPPI VETERANS HOME
PURCHASE BOARD                                    PLAINTIFF

VERSUS                          CIVIL ACTION NO. 5:07cv47-DCB-MTP

STATE FARM FIRE &
CASUALTY COMPANY                                  DEFENDANT

<u>**MEMORANDUM OPINION**</u>

This matter comes before the Court on the plaintiff's Motion to Remand [**docket entry no. 3**]. Having reviewed the motion, response, rebuttal, briefs, applicable statutory and case law and being otherwise fully advised as to the premises, the Court finds as follows:

**FACTS**

On December 19, 1997, Ray Charles Alsworth obtained a home loan from the Mississippi Veterans Home Purchase Board to purchase a house in Jefferson County, Mississippi. That same day he executed a note and deed of trust in favor of the Purchase Board. At all relevant times, the house was insured by State Farm Fire and Casualty Company.[1] Mr. Alsworth defaulted on his loan in August of 2004, and foreclosure proceedings were instituted on December 10, 2004.[2]

---

[1] The State Farm policy listed the Purchase Board as the sole mortgagee.

[2] Mr. Alsworth died before the foreclosure process began.

On January 26, 2005, a public auction was held for the Alsworth property. The Purchase Board placed a bid of $60,711.92, and then informed the trustee to "transfer and assign the bid to convey title to the foreclosed property to the Secretary of Veterans Affairs ("VA"), an Officer of the U.S.A." The Purchase Board won the auction, and on January 27, 2005, the Purchase Board mailed a "Notice of Election to Convey and/or Invoice for Transfer of Property" to the VA.

On January 29, 2005, the Alsworth house was destroyed in a fire. The Purchase Board was not informed of the fire until February 2, 2005. Later that same day, the Purchase Board notified the VA of the loss. Nevertheless, the VA recorded a deed in its favor regarding the house on February 3, 2005.

Also on February 3, 2005, the Purchase Board informed State Farm of the fire and sent a letter to State Farm wherein it instructed State Farm to endorse the insurance policy to the VA. On April 13, 2005, the VA formally submitted a claim to State Farm for the loss of the house. At some point between April 13th and April 20th, State Farm advised the VA that it does not endorse policies and denied the VA's claim. On April 20, 2005, after receiving State Farm's denial letter, the VA notified the Purchase Board that, pursuant to the VA handbook and the Code of Federal Regulations, it could not accept the Alsworth property. On April 26, 2005, the VA executed a quitclaim deed wherein the VA

transferred all of its interest in the Alsworth house to the Purchase Board.

On May 9, 2005, the Purchase Board submitted to State Farm a "Mortgagee Proof of Loss Claim" of $61,013.57. On August 8, 2005, the Purchase Board received a denial letter from State Farm. The denial letter explained that the Purchase Board lost its insurable interest as the property's mortgagee on January 26, 2005 because the Purchase Board's deed of trust was extinguished by its successful bid for the property.

On January 29, 2007, the Purchase Board filed suit in the Circuit Court of Jefferson County, Mississippi asserting claims for breach of contract and breach of the duty of good faith and fair dealing. The Purchase Board contends in its complaint that State Farm breached its insurance contract by (1) denying the Purchase Board's claim, and, in the alternative, (2) refusing to endorse the Alsworth policy to the VA. The plaintiff seeks compensatory damages as well as "[a]ll costs, disbursements, pre-judgment interest, expert witness fees and reasonable attorney's fees that are allowed pursuant to Mississippi law." (Comp. 9.) The action was removed to this Court on March 5, 2007 on the bases of both diversity and federal question subject matter jurisdiction. The Purchase Board then filed a Motion to Remand [docket entry no. 3], wherein it argues that the statutory prerequisites for jurisdiction have not been met.

**DISCUSSION**

Federal district courts are courts of limited jurisdiction and may only invoke jurisdiction over actions when authorized to do so by either the Constitution or statute. On removal, the defendant has the burden to establish subject matter jurisdiction by a preponderance of the evidence. See Pullman Co. v. Jenkins, 305 U.S. 534, 540 (1939); Carson v. Dunham, 121 U.S. 421, 425-26 (1887); Jernigan v. Ashland Oil Co., 989 F.2d 812, 815 (5th Cir. 1993); Gaitor v. Peninsular & Occidental S.S. Co., 287 F.2d 252, 253-54 (5th Cir. 1961). "Only state-court actions that could have originally been filed in federal court may be removed to federal court by the defendant." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987).

**I.   DIVERSITY JURISDICTION**

In a removal action based on diversity jurisdiction, the defendant must prove both (1) diversity of citizenship and (2) an amount in controversy in excess of the statutory threshold, exclusive of interests and costs. See 28 U.S.C. § 1332. In the case at bar, both prongs are at issue. The plaintiff asserts that it is not a "citizen" for purposes of Section 1332. Moreover, the plaintiff contends that even if it is a citizen, its claim for relief falls short of the $75,000.00 amount in controversy requirement.

> A.   The Mississippi Veterans Home Purchase Board is an Arm of the State of Mississippi

-4-

Section 1332 of Title 28 requires that diversity exist between **citizens** of different states. Simply put, "a state is not a 'citizen' for the purposes of diversity jurisdiction." Tradigrain, Inc. v. Miss. State Port Auth., 701 F.2d 1131, 1131 (5th Cir. 1983). State agencies, however, may or may not be citizens. If the state is truly the real party in interest, the agency is considered to be the state's alter ego and, thus, not a citizen. Id. If, on the other hand, the agency is independent of the state, the agency is considered to be a citizen of the state within which it is located. Id. The analysis used to determine whether an agency is the alter ego of the state for diversity jurisdiction purposes is "virtually identical" to the Eleventh Amendment's sovereign immunity analysis. Id.

In PYCA Industries Incorporated v. Harrison County Waste Water Management District, 81 F.3d 1412 (5th Cir. 1996), the Fifth Circuit discussed Tradigrain in depth. The PYCA court listed six factors to help guide district courts in determining whether a state agency is a citizen for diversity jurisdiction purposes:

(1) whether state statutes and case law characterize the agency as an arm of the state;

(2) the source of entity funding;

(3) the degree of local autonomy;

(4) whether the entity is concerned primarily with local, as opposed to statewide problems;

(5)    the authority to sue or be sued in its own name; and

(6)    the right to hold and use property.

81 F.3d at 1416.  As in any balancing test, some factors will inevitably weigh in favor of each outcome.  <u>Tradigrain</u>, 701 F.2d at 1133.

The Purchase Board was established by the Mississippi Legislature in 1946 with the express purpose of aiding veterans "to become rehabilitated and to become as quickly as possible self-sustaining."  Miss. Code. Ann. § 35-7-1.  While the Board has some discretion in carrying out its mission, the ways and means by which it operates have been strictly constrained by the Legislature.  In short, the Board provides home loans to qualified Mississippi veterans.  The vast majority of these loans are guaranteed by the VA.

Under state law, the Board is generally treated as an arm of the state.  The Board must submit both an annual budget and an annual report to the State Fiscal Management Board, the Legislative Budget Office, and the legislative appropriation committees.  Miss. Code Ann. § 35-7-45.  All funds of the Board are maintained in the state treasury, and the Board's financial activities are subject to oversight by the State Auditor.  Miss. Code Ann. § 7-7-1. Moreover, the Board's employees fall within the protections of the state personnel system law, Mississippi Code Section 25-9-101, *et*

*seq.*[3]  <u>Phillips v. Mississippi Veterans Home Purchase Board</u>, 674

So. 2d 1240, 1241 (Miss. 1996) (addressing the application of the

state personnel system appeal process to a Purchase Board

employee's claim of wrongful termination).

Although initially funded through a legislative apportionment,

the Board is now self-funded. The Legislature created a "revolving

fund," which it designated to be segregated from other treasury

funds. This revolving fund consists of state appropriations, fees

paid by borrowers, funds received as repayment on loans, and other

mortgage associated costs. It is with the money held in its

revolving fund that the Board makes new home loans and pays its

administrative costs. This factor weighs in favor of neither

party. Although the Board is now self-sufficient, it was initially

funded by the State, and there is no statutory authority preventing

further apportionments from the general fund.[4]

---

[3]The state personnel board provides terminated employees an administrative forum to contest his or her dismissal. Only those in "state service" may bring claims before the state personnel board.

[4]Another important factor is whether the state is obligated to answer for the debts of the agency. <u>See</u> <u>Barron v. Deloitte and Touche, LLP</u>, 381 F.3d 438, 440 (5th Cir. 2004). Until 2005, the Purchase Board was granted the authority to issue bonds. <u>See</u> Laws, 1985, ch. 501, § 1. The statute expressly provided, "Bonds and interest coupons, if any, issued under this section shall never constitute an indebtedness of the State of Mississippi." <u>Id.</u> The Board's statutory authority to issue bonds was repealed in 2005, Laws, 2005, ch. 521, § 10. No evidence has been presented by either side concerning whether the state is responsible for the Board's general debts; therefore, this important factor is neutral.

The third factor concerns the degree of local autonomy and discretion that the Board has in exercising its duties. PYCA Indus., 81 F.3d at 1416 (explaining Tradigrain). The Board's actions are closely regulated by statute. The qualifications of borrowers, the type of property which can secure a loan, the maximum amount of funds which can be used to pay administrative expenses, and the sale of its loans on the secondary market are all governed by statute and subject to oversight by the state. In the private sector, these issues compose the primary issues with which a lending institution concerns itself. Although the Legislature enabled the Board "to make and promulgate such reasonable rules and regulations . . . as it shall deem to be necessary," the Board cannot adopt a regulation which runs counter to the restrictions found in the Mississippi Code. Knight, Atty. Gen. Op. No. 94-0051, 1994 WL 117305 (Miss. March 9, 2004). Accordingly, the Board must operate within very narrow parameters which have been delineated by the Legislature. The fact that the Board retains little discretion over the essential matters of its business supports a finding that the Board is an arm of the state.

The scope of the Purchase Board is clearly that of the state, rather than local level. The Board is instructed to "monitor applications and purchase distribution throughout the state" so that home loans are spread proportionately across the state. Miss. Code Ann. § 35-7-15. The Board is further empowered to limit

funding or provide financial incentives in order to assure that its funds are evenly spread. Id. This factor weighs in favor of the Board's position.

The Purchase Board has the authority to sue or be sued in its own name. Although the Mississippi Attorney General's Office represents the plaintiff in this case and represented the Board in Phillips, supra, the Board has been authorized to employ independent legal counsel, if it deems such a course necessary. Miss. Code Ann. § 35-7-7. This factor weighs in favor of State Farm.

A related issue is the source of funds that would satisfy any potential judgment against the Purchase Board. Regents of California v. Doe, 519 U.S. 425 (1997) (stating that the source of funds which would satisfy a judgment is of "considerable importance" in the Eleventh Amendment "arm of the state" analysis). The Purchase Board asserts that any judgment obtained against it would be paid directly from the state treasury. (Mem. Auth. M. Remand, 12-13.) In support of its contention, the Board argues that the Legislature has carefully outlined how the Board may use its revolving fund, and since the Legislature has not expressly authorized the use of the revolving fund to satisfy a money judgment against it, any such judgment would necessarily operate against the state. Id. The defendant argues that the Legislature's silence on the matter is irrelevant because "any

monetary judgment against the Plaintiff would be covered by the VA's indemnity provision. <u>See</u> [38] C.F.R. § [36.]4300." (Defendant's Mem. Auth. Resp. M. Remand, 7.) After a diligent search of the Code of Federal Regulations, the Court has failed to find any regulation which authorizes the Department of Veterans Affairs to indemnify a lender that incurred a money judgment as a result of making a VA guaranteed loan. Further, even assuming such an indemnity provision exists, the United States Supreme Court instructed in <u>Regents of California v. Doe</u>, that in the Eleventh Amendment sovereign immunity context, "it is the entity's **potential legal liability**, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first place, that is relevant." 519 U.S. at 431 (emphasis added) (holding that the State of California did not shed its sovereign immunity by the fact that the United States Department of Energy would ultimately pay any monetary judgment levied upon the State).

Moreover, the Board is mandated to apply 99% of its revolving fund to new loans. Miss. Code Ann. § 35-7-45 ("All funds in the revolving fund in excess of the one percent (1%) administrative expense allowance shall be expended or committed for new loans with the exception of the reserve judged necessary by the Board."). Therefore, assuming that the Board had exceeded its 1% administrative expense allotment, the Board would lack the authority to pay any monetary judgment out of its revolving fund.

It would be up to the Legislature to either appropriate additional funds to pay the judgment or to relax its restriction on the Board's use of funds. Both approaches require legislative action; thus, this factor weighs in favor of finding that the Board is an arm of the state.

The final factor to be considered is whether the Board is authorized to hold property in its own name. In its role as lender, the Board regularly obtains title to land. Additionally, the Board is expressly authorized to "establish offices and employ an adequate staff to serve the citizens of Mississippi as it deems necessary." Miss. Code Ann. § 35-7-11. No evidence has been presented to show whether the Board holds the title to its office space; however, the statute apparently grants the Board the authority to purchase property for the purpose of establishing an office if the Board so desires. Accordingly, this factor weighs in favor of State Farm's position.

Given the strict restrictions placed upon the Board by the State, its statewide focus, and the pervasive oversight by the State Auditor and other state bodies, the Court finds that the defendant has failed to show that the parties are diverse. The above mentioned factors lead the Court to conclude that the Board is an arm of the state and not a "citizen" for the purpose of diversity jurisdiction.

B. <u>The Amount in Controversy Requirement is Not Met</u>

Even assuming, *arguendo*, that the Purchase Board is a citizen, the Court lacks jurisdiction over this matter because the defendant has failed to show that the amount in controversy requirement is met. In this action, the plaintiff seeks compensatory damages as well as "[a]ll costs, disbursements, pre-judgment interest, expert witness fees and reasonable attorney's fees that are allowed pursuant to Mississippi law." (Comp. 9.) Although the plaintiff's insurance claim was for $61,013.57, the state court complaint, as is often the case, did not contain an *ad damnum* clause. The Fifth Circuit, in <u>White v. FCI USA, Inc.</u>, 319 F.3d 672 (5th Cir. 2003), described the following procedure which should be used to determine whether the requisite amount in controversy has been established:

> In removal practice, when a complaint does not allege a specific amount of damages, the party invoking federal jurisdiction must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. The district court must first examine the complaint to determine whether it is "facially apparent" that the claims exceed the jurisdictional amount. If it is not thus apparent, the court may rely on "summary judgment-type" evidence to ascertain the amount in controversy.

<u>White</u>, 319 F.3d at 675 (quoting <u>St. Paul Reinsurance Co. Ltd. v. Greenberg</u>, 134 F.3d 1250, 1253 (5th Cir. 1998). If the defendant carries its burden and proves by a preponderance that the plaintiff's claim is for more than $75,000.00, the burden then shifts to the plaintiff to prove by a "legal certainty" that its

recovery will not exceed the statutory minimum. <u>White</u>, 319 F.3d at 676 (quoting <u>DeAguilar v. Boeing Co.</u>, 47 F.3d 1404, 1412 (5th Cir. 1995).

The defendant argues that since this action concerns a liquidated damages claim, the plaintiff, if it ultimately prevails, would be entitled to both attorneys' fees and prejudgment interest on $61,013.57. State Farm asserts that these amounts should therefore be included in the amount in controversy, and when prejudgment interest and attorneys' fees are combined with the plaintiff's insurance claim, the amount in controversy requirement is easily met.

### 1. The Plaintiff's Claim for Prejudgment Interest

As a general matter, Section 1332 instructs that interest should be excluded from determining the amount in controversy. Such is not always the case, though. In <u>Brown v. Webster</u>, 156 U.S. 328 (1895), the Supreme Court distinguished between "interest as such," which must not be taken into account when computing the amount in controversy, and interest "as an instrumentality in arriving at the amount of damages to be awarded on the principal demand." Interest may be considered an element of damages when the "interest is owed as part of an underlying contractual obligation." <u>Transaero, Inc. v. La Fuerza Area Bolivinia</u>, 24 F.3d 457, 461 (2d Cir. 1994). Such is the case when a plaintiff sues to collect on a bond coupon, <u>Edwards v. Bates County</u>, 163 U.S. 269 (1896), when

a plaintiff sues for damages and injunctive relief under a state usury law, <u>Parris v. Mego Mortg. Corp.</u>, 14 Fed. Appx. 394, 397 n.2 (6th Cir. 2001), or when a plaintiff sues for rescission of a loan agreement, <u>Roberts v. Chandaleur Homes, Inc.</u>, 237 F. Supp. 2d 696, 698 (S.D. Miss. 2002).  When interest is sought merely as an accessory to an underlying injury and not part of the principal demand, it should not be included in the amount in controversy. <u>Brown</u>, 156 U.S. at 330.

In the breach of contract suit before the Court, the plaintiff's principal claim is for $61,013.57.  Prejudgment interest is nothing more than an accessory claim which arises solely by virtue of the defendant's failure to pay on the insurance policy.  Moreover, the fact that the plaintiff may be entitled by state law to recover prejudgment interest does not require its inclusion in the amount in controversy.

### 2.    <u>The Plaintiff's Claim to Attorneys' Fees</u>

Ordinarily, attorneys' fees are not included in the amount in controversy unless they are authorized by statute or a contract between the parties.  <u>Manguno v. Prudential Prop. & Cas. Ins. Co.</u>, 276 F.3d 720, 723 (5th Cir. 2002) (including attorneys' fees which were authorized by state statute); <u>Graham v. Henegar</u>, 640 F.2d 732, 736 (5th Cir. 1981) (stating that attorneys' fees which are authorized by statute or contract may be included in the amount in controversy).  It is undisputed that there is no contract

-14-

authorizing the imposition of attorneys' fees in this case.  Also, the defendant has failed to point to any statutory authority which would allow the plaintiff to recover attorneys' fees if it prevails on the merits.

Inasmuch as the defendant has failed to prove by a preponderance of the evidence that the amount in controversy exceeds $75,000.00, the Court lacks diversity jurisdiction over this matter.


## II.  FEDERAL QUESTION JURISDICTION

As with diversity jurisdiction, the defendant bears the burden of proving the existence of federal question jurisdiction.  Section 1331 of Title 28 provides that district courts have original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States."  It is undisputed that there is no federal cause of action explicitly governing this action.  The complaint, on its face, appears to assert nothing more than state law claims.  The defendants rely, however, on <u>Grable & Sons Metal Products, Incorporated v. Darue Engineering & Manufacturing</u>, 545 U.S. 308 (2005), which stands for the proposition that under certain circumstances, federal question jurisdiction may exist over a state law claim which implicates a sufficiently real and substantial question concerning the

construction and effect of federal law. "But even when the state action discloses a contested and substantial federal question, the exercise of jurisdiction is subject to a possible veto. For the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." Grable, 545 U.S. at 311–12.

State Farm contends that "the resolution of Plaintiff's cause of action requires the Court to make a determination of whether there was a transfer of title to real property to the VA." (N. Removal, 10.) State Farm further asserts that this inquiry can only be answered by the interpretation and construction of the VA Handbook and the relevant federal regulations, which are codified in 38 C.F.R. § 36.4300 *et seq.* Apparently, the defendant relies on 38 C.F.R. § 36.4320(h), which lists several prerequisites that must be met before a lender may convey property to the VA which has been foreclosed.[5] This list provides that "the conveyance or transfer of any property to the [VA] . . . shall be subject to the following provisions: (2) . . . the [lender] shall obtain endorsements on all

---

[5]In its brief, State Farm puts forward the following issues which it asserts require the interpretation of federal law: "(1) How a property is transferred pursuant to a trustees deed and notice of election to convey, (2) what constitutes acceptance of the conveyance by the VA, (3) under what circumstance the VA may reject a conveyance of property, and (4) when the risk of loss for properties shifts from a holder to the VA." State Farm never articulated exactly what provisions of the Code allegedly govern these issues.

[existing] insurance policies naming the Secretary as an assured, as his/her interest may appear." 38 C.F.R. § 36.4320(h). In addition, Section 38.4320(h)(7) states, "the [lender] shall bear such risk of loss [i.e., loss resulting from the property's destruction] from the date of acquisition by the [lender] to the date such risk of loss is assumed by the Secretary. . . . [T]he Secretary's assumption of the risk of loss will be deferred until . . . the property has been conveyed or transferred to the Secretary."

The facts reveal that the Purchase Board assigned its winning bid for the Alsworth house to the VA on January 26, 2005. Said property was destroyed by fire on January 29, 2005, and the VA recorded its deed to the property on February 3, 2005. State Farm argues that these facts require the Court to make the determination of whether to apply either (1) the traditional state law rules governing the conveyance of real property, or (2) the federal regulations cited above, *supra*, which according to State Farm, may invalidate the conveyance to the VA.[6]

    A.    Grable and Empire Healthchoice

_____

[6]The Court makes no ruling on the propriety of the defendant's argument that the federal regulation would work to invalidate the conveyance to the VA. Likewise, the Court expresses no opinion as to whether state law or the federal regulation should apply to such conveyances. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-94 (1998) (cautioning district courts about the improvidence of issuing advisory opinions based on nothing more than hypothetical jurisdiction).

In <u>Grable</u>, the plaintiff filed a quiet title action in state court against a purchaser who had bought the plaintiff's property at an IRS tax sale. 545 U.S. at 310. The plaintiff's theory, and indeed the only disputed issue in the case, was that the foreclosure sale was void because the IRS failed to provide the plaintiff with proper notice of foreclosure. The defendant removed the action, the plaintiff's motion to remand was denied, the Sixth Circuit affirmed, and the United States Supreme Court granted certiorari and affirmed. As stated by the Supreme Court, "Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case." <u>Grable</u>, 545 U.S. at 315. Moreover, the Court held that "it is the rare state quiet title action that involves contested issues of federal law. Consequently, jurisdiction over actions like Grable's would not materially affect, or threaten to affect, the normal currents of litigation." <u>Id.</u> at 319.

Just last year the Supreme Court further elaborated upon <u>Grable</u> in <u>Empire Healthchoice Assurance, Incorporated v. McVeigh</u>, --- U.S. ---, 126 S. Ct. 2121 (2006). Joseph McVeigh was a federal employee who received federal health insurance. The Office of Personnel Management ("OPM") contracts with Blue Cross Blue Shield ("BCBS") to provide insurance coverage to federal employees. BCBS

in turn contracts with other insurance providers, Empire Healthchoice in this case, to actually provide health insurance to federal employees. The contract between OPM and BCBS is binding on all federal employees who participate in the federal health plan.[7] The contract between OPM and BCBS requires each employee beneficiary to reimburse her health care provider in the event that a third-party is held responsible for causing the beneficiary's injury.[8]

Joseph McVeigh was injured and received $157,309.00 in medical benefits from Empire. After her husband's death, Denise McVeigh instituted a state court tort action against the alleged tortfeasor who caused her husband's injuries and obtained a $3,175,000.00 settlement. Empire, seeking reimbursement for the $157,309.00 it paid in health benefits, filed suit in federal court alleging that Denise McVeigh breached the reimbursement provision of the health insurance plan. In its complaint, Empire Healthchoice asserted federal question jurisdiction because the Federal Employee Health Benefit Act ("FEHBA") preempted state law on issues relating to policy coverage. FEHBA is silent, however, as to the insurers right to subrogation; instead, the subrogation provision of the

---

[7]The contract between OPM and BCBS provides: "By enrolling or accepting services under this contract, [enrollees] are obligated to all terms, conditions, and provisions of this contract."

[8]Each participating employee receives a BCBS Plan Statement which outlines the employee's duty of subrogation.

plan is only addressed in the contract between OPM and BCBS.

The defendant moved for dismissal based on lack of subject matter jurisdiction, which was granted by the District Court. The Second Circuit affirmed, and the United States Supreme Court affirmed the Second Circuit. The Supreme Court stated that _Empire Healthchoice_ was "poles apart from _Grable_." _Empire Healthchoice_, 126 S. Ct. at 2137. _Grable_, the Court explained, centered around one substantial issue of federal law, "and its resolution was both dispositive of the case and would be controlling in numerous other cases." _Id._ _Empire Healthchoice_, on the other hand, presented a case that was "fact-bound and situation-specific." _Id._

The Court noted that the **contract** between OPM – a federal agency – and BCBS was the source of Empire's claim to reimbursement. The employee's duty of subrogation was imposed purely by contract, not federal statute. Thus, it was that same contract which gave rise to Empire's cause of action. The Court held that even though there was a federal element to the contract, i.e., the contract was entered into by a federal agency on behalf of all federal employees, the federal interest at stake was not sufficient "to open the arising under door." _Id._ at 2137.

B.    Application of Grable and Empire Healthchoice

The case at bar more closely resembles _Empire Healthchoice_ than _Grable_. Unlike _Grable_ which concerned a single cause of

action and was centered around one disputed issue of law, the Purchase Board alleges three distinct causes of action. The relevant federal regulation applies to only one of those claims. Further, the resolution of the effect and construction to be given 38 C.F.R. § 36.4320 is not necessarily dispositive to that claim.

The defendant argues that if the Court construes Section 36.4320 in such a way that it would void the VA's title, the plaintiff's "breach of contract claim for failure to endorse the insurance policy" would fail.[9] The defendant is correct that such an interpretation of the federal regulation may be dispositive of the failure to endorse claim. However, if the Court finds that Section 36.4320 has no effect on the deed recorded by the VA on February 2, 2005, State Farm may nevertheless prevail by showing that it had no contractual duty to endorse the Alsworth policy to the VA. As such, there are potentially disputed issues of state law concerning the failure to endorse claim.

Moreover, the interpretation of Section 36.4320 is wholly irrelevant to the plaintiff's other causes of action. Black's law dictionary defines "dispositive" as "being a deciding factor (of a fact or factor); bringing about a final determination." The federal question in _Grable_ was clearly dispositive: either the

---

[9]The defendant claims that if the VA's deed is held to be void in light of the regulation, the VA never acquired an ownership interest in the property and therefore lacked any insurable interest.

federal statute invalidated the tax sale or it did not.  There were no other disputed issues.  Section 36.4320 is not necessarily dispositive of this action; thus, this case "does not fit in the special and small category" of federal question cases which are "predicated on the centrality of a federal issue."  Empire Healthchoice, 126 S. Ct. at 2136.

Further, the construction of the federal regulation at issue in this case is not an essential element of the plaintiff's claim as it was in Grable.  See Bennett v. Southwest Airlines, Co., 484 F.3d 907, 910 (7th Cir. 2007) (holding that "the national regulation of many aspects of air travel" does not require the invocation of federal jurisdiction over a state law tort claim "in the wake of a crash").  The defendant proffers the regulation as a defense, which the defendant contends should be construed to shield it from liability.  The existence of federal question jurisdiction should be assessed on the face of a well-pleaded complaint, not by the availability of a federal defense.  See generally Tennessee v. Union Planters' Bank, 152 U.S. 454 (1894); Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1 (1983).

## CONCLUSION

Inasmuch as diversity does not exist among the parties and the amount in controversy threshold amount is not met, the Court lacks diversity of citizenship jurisdiction over this action.  Similarly, since this action does not arise under the Constitution, laws or

treaties of the United States, federal question jurisdiction is not present under either Section 1331 or Grable. Due to the Court's lack of subject matter jurisdiction, this action must be remanded to the Circuit Court of Jefferson County, Mississippi pursuant to 28 U.S.C. § 1447(c). Accordingly,

IT IS HEREBY ORDERED that the plaintiff's Motion to Remand [**docket entry no. 3**] is **GRANTED.**

SO ORDERED, this the __21st__ day of __June__, 2007.


__s/ David Bramlette__
UNITED STATES DISTRICT JUDGE